1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JEFFREY ROBERT MCKEE,

                          Petitioner,

        v.

JAMES KEY,

                          Respondent.

CASE NO. 2:16-cv-1670-JCC-BAT

**REPORT AND
RECOMMENDATION**

Petitioner Jeffrey Robert McKee was found guilty by a state court jury on two counts of first degree rape and two counts of attempted first degree rape. Dkt. 25, Exhibit 1. He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and in his amended petition, raises two claims: (1) violation of his public trial right when the trial judge closed the courtroom to individually question prospective jurors; and (2) ineffective assistance of appellate counsel (IAAC) for failing to raise the public trial right violation on direct review. Dkt. 21.

## SUMMARY CONCLUSION AND RECOMMENDATION

Because he failed to object at trial or on direct review to the alleged closure of the courtroom during questioning of potential jurors, Mr. McKee forfeited his public trial right under federal law and therefore his first claim should be denied. Even though the Washington appellate courts addressed the public trial claim on collateral review, they resolved the claim as an ineffective assistance of counsel claim and ultimately required a showing of prejudice. Similarly, pursuant to *Weaver v. Massachusetts*, ─── U.S. ───, 137 S.Ct. 1899, 198 L.Ed. 2d 420 (2017), Mr. McKee may bring his public trial claim as an IAAC claim but must show that his appellate

1  counsel's deficient performance caused prejudice (*i.e.*, the fact that the underlying public trial

2  claim would constitute structural error if the underlying claim was raised on direct appeal does

3  not eliminate the need to prove prejudice on collateral review.)

4        The Washington Supreme Court concluded that the record on appeal did not show that

5  the judge had closed the courtroom to the public and therefore, appellate counsel could

6  reasonably decide as a tactical matter not to raise a public trial claim on appeal. This was not an

7  unreasonable determination of the facts and Mr. McKee fails to show that the state court

8  adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable

9  application of, clearly established federal law, as determined by the Supreme Court of the United

10  States. For these reasons, the undersigned recommends that the habeas petition be denied.

**FACTS OF THE CASE**

12  **A.      Facts of the Crime**

13        The Washington Court of Appeals provided the following summary of facts underlying

14  Mr. McKee's convictions:

15              On June 4, 2003, Jearlean Bradford contacted King County Sheriff's
16        Detective Sue Peters. Peters was acquainted with Bradford through her work with
        the Highway Intelligence Team (HITS), a group of officers who work to
17        document and establish rapport with prostitutes working the area around Pacific
        Highway South between SeaTac and Shoreline. Bradford said that she was sitting
18        at a bus stop when a white male in a clean, red pickup truck pulled over and
        offered to give her a ride and some beer money. Bradford accepted. Eventually
19        Bradford agreed to perform oral sex for $30. Bradford said that the man drove her
        to an area near a park, then suddenly grabbed her head, forced it toward his
20        exposed penis, and ordered her to "suck his dick." Bradford said that when the
        man saw her "brothers" approaching, he pushed her out of the truck and drove
21        away. Bradford provided a detailed description of the suspect and said that he was
        driving a red truck with Harley-Davidson floor mats and license plate number
        A98146J. The truck was registered to Jeffrey McKee.
22

23              On June 5, 2003, Detective Peters was contacted by Lynae Korbut, whom
        Peters also knew through the HITS program. Korbut said that two nights earlier
        she was walking on Kent-Des Moines road near Pacific Highway South when a

clean-cut white male in a red pickup truck pulled over and asked if she needed a ride. Korbut said she did not plan to proposition the man for sex because she thought he was an undercover police officer, but she accepted his offer of a ride. He drove her to a convenience store, where he bought her a wine cooler and a pack of cigarettes. Korbut said that after they left the store, she tried to give the man directions to where she wanted to go, but instead he drove to a dead-end road, exposed his penis, put a gun to her head, and ordered her to "suck my dick, bitch." Korbut said that after he forced her to perform oral sex at gunpoint, he ordered her to undress and then raped her vaginally and anally from behind. Korbut said that when he was finished, he threw her clothes out of the truck and left her naked in the street. She described her attacker in detail and said his red truck had Harley-Davidson floor mats and a license plate number beginning with "A."

On June 18, 2003, Jamie Lee Ray reported to police that she had been raped a couple of weeks earlier by a clean-cut white male with short blondish-brown hair and a medium build. Ray said that she and her friend Muna Absiya were walking near Pacific Highway South when a man in a red truck pulled up and offered her a ride. Absiya recognized him as a man who had previously picked her up in his red truck and raped her orally and vaginally before she managed to escape. Absiya warned Ray not to get in the truck, but she did anyway. Ray said that the man drove to the parking lot of a daycare center, grabbed her by the hair, put a small black handgun to her head and said "suck my dick, bitch." After forcing her to perform oral sex, he ordered her to undress and raped her vaginally and anally at gunpoint. Ray said that when he was finished, he threw her and her clothes out of the truck and drove away.

Jeffrey McKee was arrested and charged with four crimes: count I, first degree rape of Lynae Korbut while armed with a firearm; count II, attempted second degree rape of Jearlean Bradford; count III, second degree rape of Muna Absiya; and count IV, first degree rape of Jamie Lee Ray while armed with a firearm. After McKee was arrested, Bradford was unable to select him from a lineup, but said McKee "would be perfect if he lost 40 or 50 pounds." Bradford did, however, identify McKee in court as the rapist. Korbut identified McKee in a photomontage, in a lineup, and in court. Absiya identified him in a lineup and in court as the man who had raped her and had picked up Ray. Absiya also identified photographs of the truck, noting the Harley-Davidson floor mats. Ray was unable to pick out McKee in a photomontage or lineup, nor could she identify him in court. However, she identified photos of McKee's truck, noting the seat covers and Harley-Davidson floor mats, and testified that McKee's gun looked like the one that was held to her head during the rape.

Jennifer Gauthier of the Washington State Patrol Crime Laboratory identified three DNA profiles in a semen stain on McKee's truck seat cover that were consistent with a mixture of genetic material from Ray, McKee, and an unknown female. Gauthier conservatively estimated that one in 9,400 individuals

could potentially have contributed the DNA consistent with Ray's profile, but was confident that Ray's DNA was contained within the semen stain.

The trial court instructed the jury that evidence on each count was cross-admissible for the purposes of proving a common scheme or plan. The jury found McKee guilty as charged on counts I and IV, both with firearm enhancements, but not guilty on counts II and III.

McKee requested an exceptional minimum sentence below the standard range, arguing that the multiple offense policy of the Sentencing Reform Act of 1981 [footnote omitted] (SRA) resulted in a clearly excessive sentence. Noting that the victims were prostitutes who were willing to have sex for money, the trial court granted McKee's request and ordered that the minimum base sentences for each of the rapes be served concurrently rather than consecutively. The trial court also imposed conditions of community custody, including restrictions on alcohol and pornography. McKee appealed, and the State cross-appealed the exceptional minimum sentence.

Dkt. 25, Exhibit 2 at 1-2.

**B.    Procedural History**

Respondent concedes Mr. McKee has properly exhausted his state court remedies.

Therefore, the state court procedural history is not repeated here. *See* Dkt. 22 at 3-4.

**C.    Facts Relating to Voir Dire**

Mr. McKee raised his public trial claim for the first time in his personal restraint petition.

The Washington Court of Appeals summarized the relevant facts as follows:

After excusals for hardship, the court asked the remaining members of the jury panel, more than 50, to answer a written questionnaire. Some questions were designed to elicit particular knowledge or bias on the subject or rape. One question asked if the juror would prefer to discuss any responses out of the presence of other jurors. The judge informed the panel that the questionnaire was to aid the attorneys and that one questions asked whether "anybody wants to be talked to individually."

So that is one thing that we do. I mean, if there's—if you have personal information you are hesitant to share in front of a bunch of people, we will talk to you individually. There will still be the court staff here and the lawyers, but anybody that wants to have sort of a semi-private—*and of course nobody will be allowed in the courtroom*—question and answer session about something that they just don't feel real comfortable talking about in front of a

group full of people, that will be part of it. The rest of it the
lawyers will use these questions to, you know, figure out what kind
of questions to ask what people, so they are just not facing you
cold turkey. So that is the reason for this.

(Emphasis added.) Some potential jurors did respond in the affirmative that they
would rather be questioned in detail outside the presence of the other jurors. The
questioning of these jurors occurred in the courtroom and was transcribed.

. . .

The record does not include the questionnaire that was actually used, but it
does include the preliminary versions proposed by the prosecutor and defense
counsel who collaborated in producing the final version. Both parties proposed to
ask whether the juror would prefer to give responses outside the presence of the
other jurors.

After the jurors returned their completed questionnaires, the 10 or so
jurors who had requested individual questioning were brought into the courtroom
one by one, questioned, and excused or sent back to the jury room. The questions
were typically phrased in terms of protecting the juror's privacy with respect to
other members of the jury, not with respect to the public in general. For example:

> [DEFENSE COUNSEL]: My question is, is that something
> you wanted to discuss out of the presence of other jurors?
> ....
> [PROSECUTOR]: Okay. Is there anything else that you
> wanted to talk about outside the presence of the other jurors?
> ....
> [THE COURT]: Ms. Johnson. We're here because you
> have stated that you wanted to discuss something out of the
> presence of the whole jury.

The transcript mentions each time a different individual juror entered the
courtroom. The presence or absence of spectators in the courtroom is not
mentioned. When the individual questioning sessions concluded, the judge
directed that the remaining jurors be brought as a group into the courtroom to hear
"the rest of the jury selection instructions." The transcript states,
"PROSPECTIVE JURORS PRESENT." There is no indication that the courtroom
was reopened to allow spectators to come in, as one would expect to find if the
courtroom had previously been closed for the "semi-private" sessions.

The transcript for the next day begins with a single juror present. This was
a juror whose request for individual questioning had been overlooked the previous
afternoon. The court said, "You asked to be talked to outside the presence of
everyone else. Can you tell me why? The juror answered, "Well, just that there's
some of the stuff I wanted to talk about .... I didn't necessarily want to bring those
up in front of everybody else." Again, though the court had reverted to individual

1    questioning, the record contains no mention of exclusion of spectators while this
2    individual was questioned and no mention of reopening the courtroom when
     regular proceedings resumed.

3    Dkt. 25, Exhibit 34.

4         In an affidavit submitted in his state personal restraint proceedings, Mr. McKee states

5    that when the individual jurors were being questioned, there was no one in the courtroom aside

6    from himself, his defense counsel, the prosecuting attorney, the trial judge, the jail guard, and

7    bailiff. Dkt. 21-2 at 76.

8                                    **STANDARD OF REVIEW**

9         The standard governing review of the state court's decision is established by the

10   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prohibits a federal

11   court from granting habeas relief "with respect to any claim that was adjudicated on the merits in

12   State court proceedings unless the adjudication of the claim resulted in a decision that was

13   contrary to, or involved an unreasonable application of, clearly established Federal law, as

14   determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

15        Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*,

16   502 U.S. 62, 67 (1991). To obtain relief, the petitioner must prove by a preponderance of the

17   evidence that the custody violates the Constitution of the United States. 28 U.S.C. § 2254. The

18   Court may grant relief only if the constitutional trial error caused actual and substantial

19   prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 (1993). A state court's interpretation of

20   state law is binding on the federal courts, even when the interpretation is made in the case under

21   review. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The state court's determination of a factual

22   issue is presumed correct unless the petitioner rebuts the determination by clear and convincing

23   evidence. 28 U.S.C. § 2254(e)(1).

**EVIDENTIARY HEARING**

An evidentiary hearing is appropriate if the habeas petitioner meets two conditions: (1) "[h]e must allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court either at the time of trial or in a collateral proceeding." *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (internal quotation marks and citation omitted).

Mr. McKee acknowledges that the record is "unambiguous" that the courtroom was closed. Dkt. 26 at 10. On the other hand, he argues that if he is not granted a writ of habeas corpus, he should be given an evidentiary hearing "through which he can further develop the facts surrounding the courtroom closure." *Id.* at 11. Mr. McKee's claims present purely legal questions that may be resolved by reference to the existing record. Whether Mr. McKee waived his public trial claim under federal law is a purely legal question, and whether his appellate counsel rendered ineffective assistance when he failed to raise the public trial right violation on direct review is a question that may be resolved by reference to the record on appeal – as it is in that record that his appellate counsel would have found evidence, if it existed, to support a public trial right violation. Accordingly, the undersigned concludes that an evidentiary hearing is not required.

**DISCUSSION**

**A.    Claim 1 – Public Trial Right- Waiver**

The Sixth Amendment guarantees a criminal defendant's right to a public trial. U.S. Const. amend VI. In *Waller v. Georgia*, the Supreme Court adopted a balancing test to determine when the presumption of openness in a public trial may give way to protect a defendant's other rights. "[T]he party seeking to close the hearing must advance an overriding interest that is likely

1    to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial

2    court must consider reasonable alternatives to closing the proceeding, and it must make findings

3    adequate to support the closure." *Waller v. Georgia*, 467 U.S. 39, 48, 104 S. Ct. 2210, 2215, 81

4    L.Ed.2d 31 (1984). A defendant's Sixth Amendment right to a public trial extends to voir dire.

5    *Presley v. Georgia*, 558 U.S. 209, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010).

6         Under federal law, a defendant can waive the public trial right guarantee by failing to

7    object to closure of the voir dire proceeding. *Peretz v. United States*, 501 U.S. 923, 936–37

8    (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960)); *see also*, *Momah v. Uttecht*,

9    2016 WL 1059404 W.D. Wash., Mar. 17, 2016, certificate of appealability granted [on issue of

10   whether petitioner waived his public trial right by failing to object at trial, although issue was

11   raised on direct and reviewed by the Washington state appellate courts] by 2016 WL 3254994,

12   W.D. Wash. June 14, 2016, and affirmed by 669 Fed. Appx. 604, 9th Cir. (June 20, 2017), *cert.*

13   *denied*, 138 S.Ct. 524 U.S. Dec. 4, 2017.

14        Mr. McKee did not object to the manner of questioning the individual jurors at trial nor

15   did he raise the issue on direct review. Thus, under federal law, he has waived his public trial

16   right claim. "Although the right to a public trial provides benefits to society as a whole, a

17   defendant may nevertheless forfeit the right, either by affirmatively waiving it or by failing to

18   assert it in a timely fashion." *United States v. Rivera*, 682 F.3d 1223, 1232 (9th Cir. 2012)

19   (internal citation omitted). Mr. McKee argues he has not waived his public trial right claim

20   because the state appellate courts addressed the claim on the merits and therefore, this Court has

21   jurisdiction to do likewise. However, the state appellate courts addressed the public trial right

22   claim not as a stand-alone claim but rather, as an IAAC claim:

23        It is unnecessary to address whether a public trial violation is also presumed
         prejudicial on collateral review because a claim like Mr. McKee's, brought as a

personal restraint petition, can be resolved on the grounds of ineffective assistance
of appellate counsel. <u>Morris</u>, 176 Wn.2d at 166.

Dkt. 25, Exhibit 34 at 2 (citing *In re Pers. Restraint of Morris,* 176 Wn.2d 157, 166, 288 P.3d

1140 (2010))(counsel's failure to raise meritorious public trial claim on direct appeal constitutes

prejudicial ineffective assistance of appellate counsel). Applying the *Bone-Club* analysis to the

facts of Mr. McKee's case, the Washington Court of Appeals concluded there was no evidence

that the public was actually excluded during voir dire. Dkt. 25, Exhibit 34 at 3-7. After agreeing

there was no evidence that voir dire actually took place in a closed courtroom, the Washington

Supreme Court stated "assuming Mr. McKee *maintains his substantive public trial claim, he*

*must show he was prejudiced* by the claimed closure." Dkt. 25, Exhibit 39 at 3-4 (emphasis

added).

      In *In re Coggin,* the Washington Supreme Court clarified that the presumption of

prejudice does *not* apply when a public trial right violation is asserted on collateral review:

> The general rule is when a personal restraint petitioner alleges a
> constitutional violation, the petitioner must establish by a preponderance of the
> evidence that the constitutional error worked to his actual and substantial
> prejudice. *In re Pers. Restraint of St. Pierre*, 118 Wash.2d 321, 328, 823 P.2d 492
> (1992). In *In re Personal Restraint of Morris*, 176 Wash.2d 157, 166, 288 P.3d
> 1140 (2012), we recognized an exception to this general rule and held that in that
> case we would presume prejudice where petitioners allege a public trial right
> violation by way of an ineffective assistance of appellate counsel claim because
> "[h]ad Morris's appellate counsel raised this issue on direct appeal, Morris would
> have received a new trial.... No clearer prejudice could be established." Because
> we decided Morris on ineffective assistance of appellate counsel grounds, we did
> not address whether a meritorious public trial right violation is also presumed
> prejudicial on collateral review. Based on our cases, we hold no presumption
> applies in this context.

*In re Coggin*, 182 Wash.2d 115, 119-120, 340 P.3d 810, 812, 813 (Wash. 2015). As explained in

more detail below vis-à-vis Mr. McKee's ineffective assistance of counsel claim, federal courts

also distinguish between objections to structural errors made at trial (where prejudice is

presumed and defendant gets a new trial) and objections to structural errors made later (where

finality concerns prevail such that the burden is on defendant to show a reasonable probability of

a different trial outcome or to show that the particular public trial violation was so serious as to

render his trial fundamentally unfair). *See Weaver v. Massachusetts,* – U.S. –, 137 S. Ct. 1899,

1909–10, 198 L. Ed. 2d 420 (2017).

Because he failed to object to the closure, Mr. McKee has forfeited his public trial right

under federal law and this claim should be denied. Mr. McKee may pursue only his ineffective

assistance of counsel claim, where in addition to showing that the violation occurred, he must

show that the closure rendered his trial fundamentally unfair.

**B.    Claim 2 - Ineffective Assistance of Appellate Counsel**

Claims of ineffective assistance of counsel on appeal are reviewed under a deferential

standard similar to that established for trial counsel ineffectiveness in *Strickland v. Washington*,

466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285,

120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Smith v. Murray*, 477 U.S. 527, 535, 106 S.Ct. 2661, 91

L.Ed.2d 434 (1986). Under that standard, petitioners challenging their appellate counsel's

performance must demonstrate (1) counsel's performance was unreasonable, which in the

appellate context requires a showing that counsel acted unreasonably in failing to discover and

brief a meritorious issue, and (2) there is a reasonable probability that, but for counsel's failure to

raise the issue, the petitioner would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. at

285–86; *see also Wildman v. Johnson*, 261 F.3d 832, 841–42 (9th Cir.2001); *Morrison v. Estelle*,

981 F.2d 425, 427 (9th Cir.1992), *cert. denied*, 508 U.S. 920, 113 S.Ct. 2367, 124 L.Ed.2d 273

(1993); *Miller v. Keeney*, 882 F.2d 1428, 1433–34 (9th Cir.1989).

1    The two prongs partially overlap in evaluating appellate counsel's performance because it

2    may be reasonable under the circumstances not to raise a particular nonfrivolous issue on appeal

3    and because that particular issue may also not have been likely to result in a reversal of the

4    defendant's conviction. *Miller*, 882 F.2d at 1434. The exercise of professional judgment in

5    framing appellate issues makes it difficult to demonstrate that counsel's omission of a particular

6    argument was deficient performance. *Smith v. Robbins*, 528 U.S. at 288. Indeed, the process of

7    winnowing out weaker arguments on appeal and focusing on those issues more likely to succeed

8    is the hallmark of effective advocacy. *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77

9    L.Ed.2d 987 (1983). "[A] lawyer who throws in every arguable point—'just in case'—is likely to

10   serve her client less effectively than one who concentrates solely on the strong arguments."

11   *Miller*, 882 F.2d at 1434. Therefore, appellate counsel has no constitutional obligation to raise

12   every non-frivolous, colorable issue on appeal. *Jones v. Barnes*, 463 U.S. at 751–54.

13   Absent contrary evidence, it is assumed that appellate counsel's failure to raise a claim

14   was an exercise of sound appellate strategy. *United States v. Brown*, 528 F.3d 1030 1033 (8th

15   Cir.2008). Failure to attack trial counsel is not ineffectiveness where trial counsel's performance

16   did not fall below the *Strickland* standard. *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th

17   Cir.1991). It is not ineffective counsel from refraining from appealing a correct ruling. *People of*

18   *the Territory of Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir.1984). Also, if there is no

19   prejudice from trial error, by extension there can be no prejudice from an appellate error

20   predicated on the same issue. *Garcia v. Quaterman*, 454 F.3d 441, 450 (5th Cir.2006).

21   As previously noted, the Washington appellate courts rejected Mr. McKee's IAAC claim

22   because the record did not show that the public was actually excluded during the individual

23   questioning of some of the prospective jurors:

REPORT AND RECOMMENDATION - 11

…Mr. McKee's personal restraint petition contends that the trial judge violated his right to a public trial by closing the courtroom during a portion of voir dire to allow individual questioning of some of the prospective jurors. Individuals were questioned in the courtroom outside of the presence of the other jurors, but the record does not demonstrate that spectators were excluded. Because there is a lack of evidence that a courtroom closure actually occurred, we deny the petition.

After excusals for hardship, the court asked the remaining members of the jury panel, more than 50, to answer a written questionnaire. Some questions were designed to elicit particular knowledge or bias on the subject of rape. One question asked if the juror would prefer to discuss any responses out of the presence of other jurors. The judge informed the panel that the questionnaire was to aid the attorneys and that one question asked whether "anybody wants to be talked to individually."

> So that is one thing that we do. I mean, if there's—if you have personal information you are hesitant to share in front of a bunch of people, we will talk to you individually. There will still be the court staff here and the lawyers, but anybody that wants to have sort of a semi-private—*and of course nobody will be allowed in the courtroom*—question and answer session about something that they just don't feel real comfortable talking about in front of a group full of people, that will be part of it. The rest of it the lawyers will use these questions to, you know, figure out what kind of questions to ask what people, so they are just not facing you cold turkey. So that is the reason for this.

(Emphasis added.) Some potential jurors did respond in the affirmative that they would rather be questioned in detail outside the presence of the other jurors. The questioning of these jurors occurred in the courtroom and was transcribed.

Mr. McKee contends the judge's statement that "of course nobody will be allowed in the courtroom" proves that a courtroom closure occurred in violation of his right to a public trial.

. . .

After the jurors returned their completed questionnaires, the 10 or so jurors who had requested individual questioning were brought into the courtroom one by one, questioned, and excused or sent back to the jury room. The questions were typically phrased in terms of protecting the juror's privacy with respect to other members of the jury, not with respect to the public in general. For example:

> [DEFENSE COUNSEL]: My question is, is that something you wanted to discuss out of the presence of other jurors?
>
> ....
>
> [PROSECUTOR]: Okay. Is there anything else that you wanted to talk about outside the presence of the other jurors?

....
[THE COURT]: Ms. Johnson. We're here because you have stated that you wanted to discuss something out of the presence of the whole jury.

The transcript mentions each time a different individual juror entered the courtroom. The presence or absence of spectators in the courtroom is not mentioned. When the individual questioning sessions concluded, the judge directed that the remaining jurors be brought as a group into the courtroom to hear "the rest of the jury selection instructions." The transcript states, "PROSPECTIVE JURORS PRESENT." There is no indication that the courtroom was reopened to allow spectators to come in, as one would expect to find if the courtroom had previously been closed for the "semi-private" sessions.

The transcript for the next day begins with a single juror present. This was a juror whose request for individual questioning had been overlooked the previous afternoon. The court said, "You asked to be talked to outside the presence of everyone else. Can you tell me why? The juror answered, "Well, just that there's some of the stuff I wanted to talk about .... I didn't necessarily want to bring those up in front of everybody else." Again, though the court had reverted to individual questioning, the record contains no mention of exclusion of spectators while this individual was questioned and no mention of reopening the courtroom when regular proceedings resumed.

Mr. McKee points out that some of the jurors who were questioned individually answered that they did not want to discuss certain information "in public," or "in open court." But these answers are not evidence that the courtroom was actually closed to members of the public. The court reporter was present, and her function had previously been explained to the prospective jurors, so it is unlikely they believed answers they gave during the individual sessions were completely confidential. And even if they did, it is not evidence of conduct by the trial judge that amounted to a courtroom closure.
. . .
The record supplied by Mr. McKee does not reveal that the court took a similar action amounting to a closure. The trial court's remark to the jury that "nobody will be allowed in the courtroom" may have been a thought, perhaps even an intention, but it was not an action or order. The court did not at any time direct either the court staff or the attorneys to close the door, put up a sign, or instruct people to leave. The judge's initial reference to a "semi-private" question and answer session in which "nobody will be allowed in the courtroom" was not a ruling. To interpret it as such would be inconsistent with the rest of the record indicating that the uppermost thought for the court and the attorneys was to encourage frank disclosure by removing the inhibiting presence of other jurors.

Dkt. 25, Exhibit 20, 1-7.

The Washington Supreme Court agreed that Mr. McKee could not prove his IAAC claim:

> To establish ineffective assistance, Mr. McKee generally must show both
> deficient performance and resulting prejudice. *State v. McFarland*, 127 Wn.2d
> 322, 334-35, 899 P.2d 1251 (1995). Counsel's performance is viewed in light of
> the entire record. *Id*. at 335. Decisions based on reasonable tactical and strategic
> reasons do not reflect deficient performance. *State v. Grier*, 171 Wn.2d 17, 33,
> 246 P.3d 1260 (2011). Counsel is presumed competent; therefore, Mr. McKee
> must show there were no conceivable legitimate strategic or tactical reasons for
> the challenged performance. *Id*. at 42. Similarly, to establish ineffective assistance
> of appellate counsel, Mr. McKee must demonstrate that appellate counsel failed to
> raise meritorious issues on direct appeal and that he was thereby prejudiced. *In re
> Pers. Restraint of Dalluge*, 152 Wn.2d 772, 778, 100 P.3d 279 (2004). If he fails
> to establish either element of the ineffective assistance claim, the court need not
> address the other element. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563
> (1996).
>
> Mr. McKee argues that he is entitled to a new trial or at least a reference
> hearing because the record shows that the trial court, in a closed courtroom,
> individually questioned prospective jurors about possible history of sexual assault.
> As the Court of Appeals noted, when explaining the procedure to the jurors, the
> trial court stated that "of course nobody will be allowed in the courtroom" during
> the questioning. *In re Pers. Restraint of McKee*, No. 67484-6-1, slip op. at 2 (Wn.
> App. July 25, 2016), https://www.courts.wa.gov/opinions/pdf/674846.pdf. But the
> record of the juror questioning, which was included with the personal restraint
> petition, does not show that the court actually closed the courtroom during the
> questioning of any jurors, either individually or as a group. On the record, the trial
> court never entered an order actually closing the courtroom or prohibiting
> observers from being present during questioning.
>
> Mr. McKee cannot establish ineffective assistance of appellate counsel
> when the record lacks the evidence needed to support a public trial claim. Put
> differently, appellate counsel cannot be ineffective in failing to make arguments
> unsupported by the record because appellate courts will not consider facts outside
> of the record on direct appeal. *See McFarland*, 127 Wn.2d at 335. Here, the
> record—even on postconviction review—contains no evidence that the voir dire
> actually took place in a closed courtroom. Thus, appellate counsel could not have
> been ineffective in failing to raise the issue. Alternatively, Mr. McKee seeks a
> reference hearing. But such a hearing will not change the fact of the record on
> appeal. Even assuming Mr. McKee can produce evidence that the trial court in
> fact closed the courtroom, that evidence would not support the claim that
> appellate counsel was ineffective.

Dkt. 25, Exhibit 39, at 2-3.

1    Mr. McKee argues: (1) the state courts erroneously concluded that there was no closure

2    of the courtroom and (2) he is not required to show prejudice to prevail on his ineffectiveness of

3    counsel claim.

4    **1.    Closure**

5    Mr. McKee argues that it is more reasonable to interpret the judge's statements "of

6    course nobody will be allowed in the courtroom" and the questioning would be "private" or

7    "semi-private" as indications that the courtroom was in fact closed. The Washington courts

8    concluded that while the judge may have intended the questioning to be private, the judge never

9    took steps to actually close the courtroom such as asking staff or the attorneys to close the door,

10   or putting up a sign, or instructing people to leave. Mr. McKee argues that court staff would have

11   interpreted the judge's words to mean that the courtroom should be closed and would have

12   independently taken steps to ensure that no one entered the courtroom and further, that any

13   spectators in the courtroom hearing the judge's words would "undoubtedly have understood" that

14   they were not welcome in the courtroom. Dkt. 26 at 6. And, he notes there were no members of

15   the public in the courtroom at the time.

16   The undersigned concludes that to engage in the amount of speculation proposed by Mr.

17   McKee is simply a bridge too far. There is no record of any affirmative action taken by the court

18   or court personnel to exclude anyone from the courtroom, to close the door, or to instruct anyone

19   to leave. There is no evidence that anyone attempted to enter the courtroom but was barred. In

20   fact, there is no evidence that there were any spectators, who were in the courtroom at the time

21   the judge spoke the words, who then understood that they were not welcome and left the

22   courtroom. Additionally, the individual questioning was not conducted in secret or in chambers,

23   but was conducted in the courtroom and the proceedings were recorded by the court

1  stenographer. The record was never sealed and presumably, the jurors knew the stenographer

2  was recording what was being said. Both parties participated in the questioning without

3  objection. The judge made no explicit rulings to open or close the courtroom before, during, or

4  after questioning any of the individual jurors.

5       Based on the record, it was not unreasonable for the Washington appellate courts to

6  conclude that the intent was to question the individual jurors outside the presence of the

7  remaining jurors to enable the individual jurors to more freely discuss potential bias arising out

8  of experiences with sexual assaults. *See*, *e.g.*, Dkt. 25, Exhibit 43 at 145 (where judge indicates

9  that "private" questioning occurred so questions could be asked "outside the presence of the

10  jury.")

11      Because he cannot show that the courtroom was closed, Mr. McKee cannot show that his

12  appellate counsel rendered ineffective assistance of counsel in failing to raise the public trial

13  right issue. Even assuming he could show the judge had closed the courtroom, Mr. McKee must

14  still show that he was prejudiced by his appellate counsel's deficient performance.

15      **2.    Prejudice**

16      Mr. McKee maintains prejudice is presumed due to the structural nature of his ineffective

17  assistance of appellate counsel claim. As discussed briefly above, the Supreme Court addressed

18  the proper standard of prejudice for a public trial right claim considered on collateral review in

19  *Weaver*. Mr. McKee argues that *Weaver* does not require a showing a prejudice in his case

20  because it deals only with claims of ineffective assistance of *trial* counsel. Dkt. 26 at 8. Mr.

21  McKee provides no basis to conclude that *Weaver* applies only to claims of ineffective assistance

22  of *trial* counsel and in fact, there appears to be no reasoned basis for drawing such a distinction.

23

REPORT AND RECOMMENDATION - 16

The core holding of *Weaver* is that if defense counsel objects to courtroom closure at trial and raises the issue on direct appeal, prejudice is presumed and the defendant gets a new trial. But where the issue is raised later, finality concerns prevail such that the burden is on the defendant to show a reasonable probability of a different trial outcome or to show that the particular public trial violation was so serious as to render his trial fundamentally unfair. In other words, absent a timely preservation of the public trial error and a timely raising of the issue on direct appeal, a defendant alleging a public trial violation generally must show prejudice in order to get a new trial. In *Weaver,* the Supreme Court directly addressed and answered the question: "[W]hat showing is necessary when the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim?" *Id*. The answer is that defendant must show deficient performance and resulting prejudice:

> As explained above, not every public-trial violation will in fact lead to a fundamentally unfair trial. Nor can it be said that the failure to object to a public-trial violation always deprives the defendant of a reasonable probability of a different outcome. Thus, when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984),] prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or ... to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

*Id*. at 1911 (citation omitted).  The rationale for placing the burden on the defendant in this circumstance as follows:

> The reason for placing the burden on the petitioner in this case, however, derives both from the nature of the error and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as [a later] ineffective-assistance-of-counsel claim. As explained above, when a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. When a defendant first raises the closure in an ineffective-assistance claim, however, the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure.

*Id.* at 1912 (citation omitted). Regarding the preference for finality, the court opined:

> When an ineffective-assistance-of-counsel claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk, and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a [later] claim alleging ineffective assistance of counsel.

*Id.* (citation omitted). In *Weaver*, a Massachusetts trial court conducted two days of jury voir dire in a murder trial in a closed courtroom. The public and defendant's mother and her minister were excluded from the courtroom by judicial officers because the potential venire pool filled the 50-60 seat courtroom. *Id.* at 1906. Defense counsel did not object to the exclusion of the public at trial and did not raise the courtroom closure issue on direct appeal. Five years after defendant's conviction and receipt of a life sentence, defendant sought a new trial, asserting ineffective assistance of counsel based on the failure to object to the courtroom closure. The Supreme Court affirmed rejection of defendant's motion for a new trial because defendant had not shown prejudice – among other things, trial was not conducted in secret or in a remote place, the closure was limited to the jury voir dire, the courtroom remained open during the evidentiary phase of the trial, and there was a record made of the proceedings that does not indicate any basis for concern other than the closure itself. The Court concluded:

> It is true that this case comes here on the assumption that the closure was a Sixth Amendment violation. And it must be recognized that open trials ensure respect for the justice system and allow the press and the public to judge the proceedings that occur in our Nation's courts. Even so, the violation here did not pervade the whole trial or lead to basic unfairness.

*Id.* at 1913.

*Weaver* rejects the notion that a voir dire closure – even though a "structural error" – is presumed prejudicial. As in *Weaver,* there was no objection at trial and no assertion of a public-

trial violation on direct appeal in Mr. McKee's case. In this situation, *Weaver* places the burden on Mr. McKee to prove he was prejudiced by the alleged closure. He has not met that burden. Even assuming the courtroom was closed to the public during the individual questioning, the questioning was not conducted in secret or in a remote location but occurred in the courtroom and on the record; both parties participated in the voir dire questioning without objection; the closure was limited to only that portion of voir dire; and the apparent goal of the questioning was to enable jurors to more freely discuss potential bias arising out of experiences with sexual assaults. Thus, even if the individual questioning of the jurors rises to the level of a Sixth Amendment violation, the violation did not pervade the whole trial or lead to basic unfairness.

Accordingly, Mr. McKee is not entitled to relief because he has not shown that the state courts' conclusion (that he failed to demonstrate either ineffective assistance or prejudice) was an unreasonable application of clearly established federal law or was based upon an unreasonable determination of facts in light of the evidence presented to the state court. The undersigned recommends that this claim should be denied.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."

1   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that

2   Mr. McKee is not entitled to a certificate of appealability in this matter.

3                                                        **CONCLUSION**

4        For the reasons above, the Court recommends that the habeas petition filed herein be

5   DENIED.  If the parties have objections to this recommendation, they must file them by **May 14,**

6   **2018**.  The Clerk should note the matter for **May 16, 2018,** as ready for the District Judge's

7   consideration if no objection is filed.  If objections are filed, any response is due within 14 days

8   after being served with the objections.  A party filing an objection must note the matter for the

9   Court's consideration 14 days from the date the objection is filed and served.  The matter will

10   then be ready for the Court's consideration on the date the response is due.  Objections shall not

11   exceed eight pages.  The failure to timely object may affect the right to appeal.

12        DATED this 23rd day of April, 2018.

13

14                           BRIAN A. TSUCHIDA

                           Chief United States Magistrate Judge

15

16

17

18

19

20

21

22

23